UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>ADAN BARAJAS BEDAL,<br><br>Defendant. | Case No.: 1:24-cr-00057 JLT<br><br>ORDER DENYING MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE<br><br>(Doc. 6) |

Since starting his supervised release less than two years ago, the defendant seeks to have the Court terminate his supervised release more than 40 months early. Though his probation officer supports the request, the government opposes it. For the reasons set forth below, the motion is **DENIED**.

**I. Background**

In December 2019, federal agents in Montana received information from a confidential source that Bedal was trafficking narcotics. (Montana Case # 9:20-cr-00002 DWM, Doc.1-1 at 2) Agents began surveillance of Bedal. *Id*. They saw him many times visit the residence of a person who was known to them as a drug dealer and distributor. *Id*. Through their observations, they did not see that Bedal had any regular employment but instead spent "a substantial amount of time frequenting several gambling establishments and gambling." *Id*.

A confidential source reported that Bedal had three pounds of crystal methamphetamine,

1  and that the CS had sold ½ pound of that amount on behalf of Bedal. (Montana Case # 9:20-cr-
2  00002 DWM, Doc. 1-1 at 3) Three days before, Bedal possessed "a large amount of marijuana."
3  *Id*.

4  On December 26, 2019, the agents executed a search warrant on Bedal's hotel room.
5  (Montana Case # 9:20-cr-00002 DWM, Doc. 1-1 at 4) They found two pounds of
6  methamphetamine hidden inside two stuffed animal toys. *Id*.; Montana Case # 9:20-cr-00002
7  DWM, Doc. 141 at 3) Bedal admitted that he was intending on redistributing the
8  methamphetamine to another person. (Montana Case # 9:20-cr-00002 DWM, Doc. 56 at 4)
9  During this encounter, Bedal reported that he had transported another package of what he
10 believed was three pounds of methamphetamine and gave an address where he believed the
11 codefendant left the package. (Montana Case # 9:20-cr-00002 DWM, Doc. 1-1 at 4) He reported
12 that the methamphetamine belonged to his co-defendant, he was selling it for the co-defendant,
13 and he considered himself to be an employee of the codefendant. *Id*. The agents went to the
14 address given to them by Bedal and obtained the package that the codefendant left there. *Id.* at 5.
15 In it was three pounds of methamphetamine. *Id*.

16 When the officers arrested Bedal, he did not go quietly. (Montana Case # 9:20-cr-00002
17 DWM, Doc. 1-1 at 5) He asked, "Where is your backup? Where is your radio" and he resisted
18 arrest until an agent placed his taser against Bedal's back. *Id*. In Bedal's room, the agents found a
19 firearm under the sheets of the bed where Bedal had been sitting.[1] *Id*. Agents determined that
20 Bedal had numerous convictions for possession of controlled substances in 2004, two convictions
21 for obstructing a peace officer, and other convictions for fraud, resisting arrest, receiving stolen
22 property, reckless driving, and driving on a suspended license. *Id*.

23 Bedal was charged in an indictment with conspiracy to possess with the intent to distribute
24 methamphetamine and possession with the intent to distribute methamphetamine. (Montana Case
25 # 9:20-cr-00002 DWM, Doc. 30) He plead guilty to the conspiracy charge and "agree[d] to forfeit

---

[1] Bedal admitted that he obtained the firearm for protection. (Montana Case # 9:20-cr-00002 DWM, Doc. 118 at 3-4) He argued at the time of sentencing that he obtained the firearm from his co-defendant because feared his codefendant and that he had no ammunition for the firearm. *Id*.

the black SS80 9 mm pistol."[2] (Montana Case # 9:20-cr-00002 DWM, Doc. 47 at 2) At his change of plea hearing, while explicitly admitting his guilt related to the conspiracy charge, Bedal explained to the judge that he was forced to be involved in the drug trafficking enterprise. (Montana Case # 9:20-cr-00002 DWM, Doc. 63 at 8, 18-19, 34-37) Despite this, the government indicated,

> The information we do have, Your Honor, is that Mr. Bedal was up in the Flathead for around a month and every day was going to casinos and McDonald's and coming back and distributing meth and came into contact with many people. Never said he was under duress, coercion, anything like that.
>
> Do I think that there is some merit to what Mr. Bedal is saying? Yes. But at this time, Your Honor, I have not personally spoken to Mr. Bedal and gotten the information. [Bedal's attorney] and I agreed that his duress defense would not survive at trial, but as Your Honor knows, there is a different standard of proof if he would like to ask Your Honor for a departure at sentencing than the amount of proof he'd have to present to a jury to get out from under the conspiracy charges.
>
> [Bedal's attorney] stated earlier that he does not believe that there is a viable defense. The government would submit to the Court I do not, either, believe there is a viable defense to the actual charge of conspiracy.
>
> But as Your Honor knows, and from the government's agreement in the plea agreement, there perhaps is some arguments that could be made to Your Honor where you might take into consideration a departure.

*Id*. at 38-39. Bedal admitted that the factual basis for his plea recited by the government was true. *Id*. at 40. The Court observed, "Mr. Bedal, I think if you went to trial and a jury heard the proof that Ms. Elliott said she could put before them, there is no doubt in my mind they would find that you were guilty, and they would do so beyond a reasonable doubt. Consequently, your plea of guilty to Count 1 of the indictment is accepted, and you now are adjudged guilty of conspiring to possess with intent to distribute methamphetamine in violation of 18 U.S. Code Section 846." *Id*. at 41-42.

At the time of sentencing, the Bedal asked the court to depart downward departure under USSG § 5K2.12, which allows a departure where a defendant committed the crime due to coercion or duress that did not amount to a complete defense. (Montana Case # 9:20-cr-00002

---

[2] The government filed a formal motion for forfeiture of the weapon, which the court granted. (Montana Case # 9:20-cr-00002 DWM, Doc. 115 at 2, Doc. 124; Montana Case # 9:20-cr-00002 DWM, Doc.128)

1  DWM, Doc. 118 at 10-12) He also asked for a departure because he had a minor role and for a

2  variance under the 3553(a) factors. *Id*. He sought a sentence of time served—which, by then was

3  14 months, followed by five years of supervised release. *Id*. at 14. Even still, on March 3, 2021,

4  the Court imposed a sentence of 70 months, followed by five years of supervised release.

5  (Montana Case # 9:20-cr-00002 DWM, Doc. 122)

6        About 19 months later, Bedal filed a motion for compassionate release based upon his

7  medical conditions, which he felt were not being adequately addressed by the BOP, and the risks

8  that he may contract COVID due to his susceptibilities. (Montana Case # 9:20-cr-00002 DWM,

9  Doc. 135, 139) The Court denied the motion stating,

10
> Bedal was involved in distributing drugs in the Kalispell area, (see PSR ¶¶ 12-14,
> 25-28), and during his arrest, investigators found approximately three pounds of
11
> methamphetamine in two stuffed animals in his possession, (see *id*. ¶¶ 20-23).
> Investigators also found a firearm in Bedal's hotel room. (*Id*. ¶ 19.) Based on this
12
> conduct, his advisory guideline range was 168 to 210 months. Yet despite his
> possession of a firearm and a significant amount of methamphetamine, Bedal
13
> received a sentence of 70 months. His existing sentence therefore already reflects a
> favorable consideration of his criminal history, his willingness to pursue treatment,
14
> and his health concerns. Put simply, Bedal's sentence was the lowest the Court
> could justify in light of his conduct. Reducing Bedal's sentence to the
15
> approximately 37 months he has served to date would denigrate the seriousness of
> his crimes and undermine respect for the law. See 18 U.S.C. § 3553(a)(2)(A)-(C).
16

17  (Montana Case # 9:20-cr-00002 DWM, Doc. 143 at 6)

18        Bedal served his sentence and began his term of supervised release on February 20, 2024.

19  Then, just 19 months into his 70-month term of supervision, in September 2025, he filed the

20  instant motion (Doc. 6). The government opposes the motion. (Doc. 9) The government argues

21  that, though Bedal has complied with the terms of his supervision, this alone is insufficient. *Id*. at

22  2. When compared to the pertinent factors set forth at 18 U.S.C. § 3553(a) and the goals of

23  supervision, the government argues that Bedal has not demonstrated that termination of

24  supervision early is justified. *Id*.

25      **II. Analysis**

26        The Court acknowledges its discretion to terminate supervision early in this case.  In

27  considering the motion, the Court notes, first, that the underlying offense was serious, and it

28  involved a large volume of drugs. Notably, before he became involved with his co-conspirator,

4

1 Bedal admitted to selling quantities of marijuana in Montana and committed his crime while
2 armed with a firearm.

3 Second, Bedal argues that the primary reason that supervised release should be terminated
4 41 months early, is to allow him to volunteer with the CASA program. The Court agrees that
5 CASA is a worthy enterprise that brings so much to the youth it serves. However, in the Court's
6 experience, these children often have suffered more than a person ever should, usually at the
7 hands of adults whom they trusted. Very often, they remain in foster care due to the criminality of
8 their parents, who remain incarcerated or remain unsuitable to parent. The irony of this current
9 petition in light of the Court's experience in the juvenile justice system and with CASA, is not
10 lost on the Court. That being said, the Court cannot criticize Mr. Bedal's desire to help these kids.
11 However, his desire and his minimal period of compliance does not justify the Court terminating
12 supervision. As recited above, he was involved in selling/trafficking volumes of narcotics before
13 he was arrested and armed himself to do so. The Court agrees with the Montana court when it
14 denied his § 2255 motion that terminating supervision now "would denigrate the seriousness of
15 his crimes and undermine respect for the law." More important, Bedal's compliance for 19
16 months does not demonstrate to the Court that he no longer poses a risk to the community.

17 The Court acknowledges that during supervised release, Bedal has done well.  He has
18 completed some college courses and has plans to continue his education. He continues to have the
19 support of his family.[3] The Court appreciates these efforts. While acknowledging that Mr Bedal
20 has been compliant, the Court notes that it has no convincing evidence that whatever enticed him
21 into committing his crime, will not do so again.[4]

22 That being said, Mr. Bedal should be proud of what he has accomplished thus far. It is not
23 easy to take responsibility for criminal conduct and, though he has repeatedly resisted the
24 accepting the punishment imposed, seemingly, he wishes to atone. However, unfortunately, the
25 Court has too many questions that have not been addressed by his moving papers. The current

---

[3] The Court notes that these same family members wrote to the Montana court at the time Bedal was sentencing seeking leniency for him.

[4] Though completing college classes is admirable and enjoying the support of his family is wonderful, a lack of education and a lack of family support were not reasons why Mr. Bedal committed his crimes.

5

evidence is insufficient to show that the public would be adequately protected or that the interests of justice warrant the relief sought here. Thus, after considering the relevant § 3553(a) factors and the § 3583(e)(1) factors, the motion for early termination of supervised release is **DENIED**.

IT IS SO ORDERED.

Dated:   **October 16, 2025**

UNITED STATES DISTRICT JUDGE