UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff,<br>v.<br>ADAN BARAJAS BEDAL,<br>Defendant. | Case No.: 1:24-cr-00057 JLT<br>ORDER DENYING MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE<br>(Doc. 21) |

The defendant has been on supervised release for 30 months—approximately 30 months fewer than the Court ordered. He seeks early termination because he has been admitted to college and because he wishes to volunteer as a Child Abuse Special Advocate. Though his probation officer supports the request, the government opposes it. For the reasons set forth below, the motion is **DENIED**.

## I. Background

In December 2019, federal agents in Montana received information from a confidential source that Bedal was trafficking narcotics. (Montana Case # 9:20-cr-00002 DWM, Doc.1-1 at 2) Agents began surveillance of Bedal. *Id*. They saw him many times visit the residence of a person who was known to them as a drug dealer and distributor. *Id*. Through their observations, they did not see that Bedal had any regular employment but instead spent "a substantial amount of time frequenting several gambling establishments and gambling." *Id*. A confidential source reported

that Bedal had three pounds of crystal methamphetamine, and that the CS had sold ½ pound of that amount on behalf of Bedal. (Montana Case # 9:20-cr-00002 DWM, Doc. 1-1 at 3) Three days before, Bedal possessed "a large amount of marijuana." *Id*.

On December 26, 2019, the agents executed a search warrant at Bedal's hotel room. (Montana Case # 9:20-cr-00002 DWM, Doc. 1-1 at 4) They found two pounds of methamphetamine hidden inside two stuffed animal toys. *Id*.; Montana Case # 9:20-cr-00002 DWM, Doc. 141 at 3) Bedal admitted that he was intending to redistribute the methamphetamine to another person. (Montana Case # 9:20-cr-00002 DWM, Doc. 56 at 4) During this encounter, Bedal reported that he had transported another package of what he believed was three pounds of methamphetamine and gave an address where he believed the codefendant left the package. (Montana Case # 9:20-cr-00002 DWM, Doc. 1-1 at 4) He reported that the methamphetamine belonged to his co-defendant, he was selling it for the co-defendant, and he considered himself to be an employee of the codefendant. *Id*. The agents went to the address given to them by Bedal and obtained the package that the codefendant left there. *Id.* at 5. In it was three pounds of methamphetamine. *Id*.

When the officers arrested Bedal, he did not go quietly. (Montana Case # 9:20-cr-00002 DWM, Doc. 1-1 at 5) He asked, "Where is your backup? Where is your radio" and he resisted arrest until an agent placed his taser against Bedal's back. *Id*. In Bedal's room, the agents found a firearm under the sheets of the bed where Bedal had been sitting.[1] *Id*. Agents determined that Bedal had numerous convictions for possession of controlled substances in 2004, two convictions for obstructing a peace officer, and other convictions for fraud, resisting arrest, receiving stolen property, reckless driving, and driving on a suspended license. *Id*.

Bedal was charged in an indictment with conspiracy to possess with the intent to distribute methamphetamine and possession with the intent to distribute methamphetamine. (Montana Case # 9:20-cr-00002 DWM, Doc. 30) He plead guilty to the conspiracy charge and "agree[d] to forfeit

---

[1] Bedal admitted that he obtained the firearm for protection. (Montana Case # 9:20-cr-00002 DWM, Doc. 118 at 3-4) He argued at the time of sentencing that he obtained the firearm from his co-defendant because feared his codefendant and that he had no ammunition for the firearm. *Id*.

the black SS80 9 mm pistol."[2] (Montana Case # 9:20-cr-00002 DWM, Doc. 47 at 2) At his change of plea hearing, while explicitly admitting his guilt related to the conspiracy charge, Bedal explained to the judge that he was forced to be involved in the drug trafficking enterprise. (Montana Case # 9:20-cr-00002 DWM, Doc. 63 at 8, 18-19, 34-37) Despite this, the government indicated,

> The information we do have, Your Honor, is that Mr. Bedal was up in the Flathead for around a month and every day was going to casinos and McDonald's and coming back and distributing meth and came into contact with many people. Never said he was under duress, coercion, anything like that.
>
> Do I think that there is some merit to what Mr. Bedal is saying? Yes. But at this time, Your Honor, I have not personally spoken to Mr. Bedal and gotten the information. [Bedal's attorney] and I agreed that his duress defense would not survive at trial, but as Your Honor knows, there is a different standard of proof if he would like to ask Your Honor for a departure at sentencing than the amount of proof he'd have to present to a jury to get out from under the conspiracy charges.
>
> [Bedal's attorney] stated earlier that he does not believe that there is a viable defense. The government would submit to the Court I do not, either, believe there is a viable defense to the actual charge of conspiracy.
>
> But as Your Honor knows, and from the government's agreement in the plea agreement, there perhaps is some arguments that could be made to Your Honor where you might take into consideration a departure.

*Id*. at 38-39. Bedal admitted that the factual basis for his plea recited by the government was true. *Id*. at 40. The Court observed, "Mr. Bedal, I think if you went to trial and a jury heard the proof that Ms. Elliott said she could put before them, there is no doubt in my mind they would find that you were guilty, and they would do so beyond a reasonable doubt. Consequently, your plea of guilty to Count 1 of the indictment is accepted, and you now are adjudged guilty of conspiring to possess with intent to distribute methamphetamine in violation of 18 U.S. Code Section 846." *Id*. at 41-42.

At the time of sentencing, the Bedal asked the court to depart downward departure under USSG § 5K2.12, which allows a departure where a defendant committed the crime due to coercion or duress that did not amount to a complete defense. (Montana Case # 9:20-cr-00002 DWM, Doc. 118 at 10-12) He also asked for a departure because he had a minor role and for a

---

[2] The government filed a formal motion for forfeiture of the weapon, which the court granted. (Montana Case # 9:20-cr-00002 DWM, Doc. 115 at 2, Doc. 124; Montana Case # 9:20-cr-00002 DWM, Doc.128)

variance under the 3553(a) factors. *Id*. He sought a sentence of time served—which, by then was 14 months—followed by five years of supervised release. *Id*. at 14. Even still, on March 3, 2021, the Court imposed a sentence of 70 months, followed by five years of supervised release. (Montana Case # 9:20-cr-00002 DWM, Doc. 122)

About 19 months later, Bedal filed a motion for compassionate release based upon his medical conditions, which he felt were not being adequately addressed by the BOP, and the risks that he may contract COVID due to his susceptibility. (Montana Case # 9:20-cr-00002 DWM, Doc. 135, 139) The Court denied the motion stating,

> Bedal was involved in distributing drugs in the Kalispell area, (see PSR ¶¶ 12-14, 25-28), and during his arrest, investigators found approximately three pounds of methamphetamine in two stuffed animals in his possession, (see *id*. ¶¶ 20-23). Investigators also found a firearm in Bedal's hotel room. (*Id*. ¶ 19.) Based on this conduct, his advisory guideline range was 168 to 210 months. Yet despite his possession of a firearm and a significant amount of methamphetamine, Bedal received a sentence of 70 months. His existing sentence therefore already reflects a favorable consideration of his criminal history, his willingness to pursue treatment, and his health concerns. Put simply, Bedal's sentence was the lowest the Court could justify in light of his conduct. Reducing Bedal's sentence to the approximately 37 months he has served to date would denigrate the seriousness of his crimes and undermine respect for the law. See 18 U.S.C. § 3553(a)(2)(A)-(C).

(Montana Case # 9:20-cr-00002 DWM, Doc. 143 at 6)

Bedal served his sentence and began his term of supervised release on February 20, 2024. Then, just 19 months into his 60-month term of supervision, in September 2025, he filed the instant motion (Doc. 6). The government opposed the motion. (Doc. 9) The Court denied the motion, and the Nonth Circuit reversed and remanded the matter for the Court to fully consider the relevant factors.

The defendant then withdrew his original motion and filed a new motion (Doc. 21). The government continues to oppose the motion (Doc. 22). Once again, the government argues that, though Bedal has complied with the terms of his supervision, this alone is insufficient. *Id*. at 2. When compared to the pertinent factors set forth at 18 U.S.C. § 3553(a) and the goals of supervision, the government argues that Bedal has not demonstrated that termination of supervision early is justified. *Id*.

///

**II. Analysis**

Mr. Bedal bears the burden of demonstrating that early termination of supervised release is justified. *United States v. Weber*, 451 F.3d 552, 559 n.9 (9th Cir. 2006)). He asserts that he has complied with the terms of supervision, his drug tests have been negative, and he wants "a fresh start." (Doc. 21 at 17) He wishes to volunteer with the CASA program to assist children placed in foster care. *Id*.

The Court acknowledges its discretion to terminate supervision early in this case. In considering the motion, the Court is obligated by 18 U.S.C. § 3583(e) to consider the relevant factors set forth in 18 U.S.C. § 3553(a)(1)[" the nature and circumstances of the offense and the history and characteristics of the defendant'], (a)(2)(B)[" to afford adequate deterrence to criminal conduct"], (a)(2)(C)[" to protect the public from further crimes of the defendant"], (a)(2)(D)[" to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"], (a)(4)[" the kinds of sentence and the sentencing range established"], (a)(5)["any pertinent policy statement . . .issued by the Sentencing Commission"], (a)(6)["the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"], and (a)(7)["the need to provide restitution to any victims of the offense"] and whether the supervisee has completed at least one year of supervision. *United States v. Ponce,* 22 F.4th 1045, 1047 (9th Cir. 2022), quoting *United States v. Emmett,* 749 F.3d 817, 819 (9th Cir. 2014). However, the Court must also consider whether termination satisfies the interests of justice. 18 U.S.C. § 3583(e). "[A] district court enjoys discretion to consider a wide range of circumstances when determining whether to grant early termination." *Emmett,* at 819.

The Court notes that the offense was very serious. Mr. Bedal repeatedly distributed large volumes of narcotics and intended to distribute more. At the time he was arrested, he possessed two pounds of methamphetamine and a firearm.[3] Though he claimed to have been coerced in

---

[3] It is concerning that rather than recognizing the seriousness of his conduct, he ignores the scourge that methamphetamine is to communities, trivializes the drug's incredibly addictive qualities, and he minimizes his conduct by saying, "His offense involved several pounds of methamphetamine, which is serious but not an especially large quantity by the standard of federal courts in California." (Doc. 6 at 4)

some manner to participate in the drug trafficking scheme, this was not his first trip to Montana to sell drugs and his conduct belied his claim of coercion in that he spent his "off-hours" in Montana at McDonald's and gambling at casinos. When the officers attempted to arrest him, he did not claim that he was being coerced. He actively resisted being taken into custody until the point that an officer was forced to take out his taser to subdue him. Thus, the nature and circumstances of the offense posed an extremely high risk of danger to the community and to the officers who attempted to stop him. 18 U.S.C. § 3553(a)(1). Thus, this factor weighs against early termination of supervision.

The Court has considered the history and characteristics of the defendant (18 U.S.C. § 3553(a)(1)) and acknowledges that Mr. Bedal did not have it easy growing up. (Doc. 21 at 8-9) Despite taking on a parental role for his younger siblings, he still managed to have a substantial employment history. *Id*. He obtained his GED despite that he has had "mental health" challenges." *Id*. While on supervision he has taken and successfully completed many college courses. (Doc. 6 at 7-11) Thus, this factor weighs in favor of early termination of supervision.

On the other hand, despite his involvement in the criminal justice system in 2004, Mr. Bedal again returned to criminal conduct in 2019, as described above. The PSR noted a significant number of crimes he committed in 2004 followed by a 15-year period of lawfulness until his arrest in 2019. Thus, Mr. Bedal has a demonstrated history of being able to comport his conduct to that required by law only to again return to criminality. This suggests that his prior punishment in 2004 was not sufficient deterrence to prevent further violations of the law (18 U.S.C. § 3553(a)(2)(B)). As to his last sentence, he says only that "if a seventy-month custodial sentence with an additional two and a half years of supervision is not sufficient, it is hard to imagine how keeping Mr. Bedal on supervised release would further deter anyone else." (Doc. 21 at 11) One would think so, and yet, this Court's docket is filled with people like Mr. Bedal, who again violate the law despite a past period of incarceration. On this motion, his burden is to demonstrate why early termination of supervision is justified. Simply asserting that it *should* be enough, does not do it.

In addition, the Court must be concerned about whether without supervision, the public

will be adequately protected from Mr. Bedal. (18 U.S.C. § 3553 (a)(2)(C)) Though he seems confident that he has overcome his past, he does not demonstrate why. This is insufficient to meet his burden. Therefore, this factor weighs against early termination of supervision.

Though Mr. Bedal is looking forward to attending college—as he should—college, especially when pursuing a double major, is no joke and the stress it brings is not something that anyone—especially a recovering drug addict—should minimize. Even still, once again, Mr. Bedal provides little information that he will not return to drug use except to note that he has not tested positive while on supervision. He argues also that "actual conduct over years of supervised release is one of the best indicators of how the defendant will comport himself in the future." (Doc. 21 at 9) The Court agrees but this doesn't support his contention.

Mr. Bedal explains that it was his drug use that caused him to reengage in criminal conduct in 2019, but he does not explain why, when had been able to resist criminality during the 15 years prior to that time, he returned to drug use and criminality. He also doesn't describe his current skill set or how it will prevent future relapse and recidivism. The fact that he has not tested positive while under supervision ignores that throughout this time, he has had the threat of consequences if he returns to drug abuse. Once supervision is lifted, he will not have this accountability, much like his circumstances in 2019. However, he does not explain how he would handle this lack of accountability differently this time.

In short, despite his past sobriety, Mr. Bedal returned to drug use and criminality for unknown reasons. He has not demonstrated what he will do differently this time. Thus, he has failed to meet his burden on this topic, and the Court finds that this factor weighs against early termination of supervision. (18 U.S.C. § 3553(a)(2)(D)).

When considering the Sentencing Guidelines (which duplicate most of the factors already discussed), the Court agrees that some factors weigh in favor of early termination C9complinace with supervision) while some do not. For example, whether he has "self-managed" is not clear. Mr. Bedal does not explain how attending college classes demonstrates that he "has the ability to avoid situations that may result in a violation of a condition of supervised release or new criminal charges." The Court need not again discuss his past ability to refrain from violations of the law

only to reengage in crime in 2019. Though the Court understands that his family provides him pro-social support, they provided him with this same prosocial support in 2019 when he committed his crime.

Thus, after considering all of the relevant factors, the Court concludes that Mr. Bedal has not demonstrated that his motion for early termination of supervised should be granted and it (Doc. 21) is **DENIED**.

IT IS SO ORDERED.

Dated: _August 28, 2026_

Jennifer L. Thurston
UNITED STATES DISTRICT JUDGE